[Cite as *In re B.P.*, 2015-Ohio-5445.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

IN RE:

    B.P. (1)

DEPENDENT CHILD

[GAYLEEN P. - APPELLANT].

CASE NO. 8-15-07

O P I N I O N

IN RE:

    B.P. (2)

DEPENDENT CHILD

[GAYLEEN P. - APPELLANT].

CASE NO. 8-15-08

O P I N I O N

**Appeals from Logan County Common Pleas Court**
**Family Court - Juvenile Division**
**Trial Court Nos. 14-CS-0017 and 14-CS-0018**

**Judgments Affirmed**

**Date of Decision:    December 28, 2015**

APPEARANCES:

    *Alison Boggs* **for Appellant**

    *Natasha R. Wagner* **for Appellee**

**SHAW, J.**

{¶1} Mother-appellant, Gayleen P., appeals the July 10, 2015 judgments of the Logan County Family Court overruling her Motion for Custody of her two teenaged daughters, and granting the Motion for Legal Custody filed by Logan County Children Services (the "Agency") designating Gayleen's adult daughter and son-in-law as the legal custodians of the minor children. On appeal, Gayleen claims the Agency failed to use reasonable efforts throughout the case to reunify her with the children, and she further argues that the trial court's judgment was not supported by the manifest weight of the evidence.

### Facts and Procedural History

{¶2} On February 18, 2014, the Agency filed complaints alleging BP(1) and BP(2), twin girls born in 1998, to be dependent children as defined by R.C. 2151.04(B) and (C). The complaints were based upon an investigation by the Agency after a Civil Protection Order was filed by the children's older sister, Amber P., on their behalves due to claims that domestic violence had occurred in the home. The information provided during the investigation indicated that incidents of domestic violence had taken place between Gayleen and her boyfriend, Bitler Noble, in front of the minor children. There was further indication that domestic violence had also occurred between Gayleen, Mr. Noble, and the children. As a result of the proceedings relating to the Civil Protection

Order, BP(1) and BP(2) were placed in the temporary custody of their adult sister and brother-in-law, Cristen and Chad W. The Agency also learned of ongoing concerns regarding Gayleen's untreated mental health issues which it claimed impaired her ability to parent and to provide a loving and nurturing home for the girls.

{¶3} The same day, the Agency filed a motion for temporary orders requesting the trial court designate Cristen and Chad as the children's temporary legal custodians and grant Gayleen parenting time. The children were appointed a guardian ad-litem ("GAL") and the Agency submitted a case plan pending the trial court's review of the complaints and motion for temporary orders. The case plan provided for objectives addressing Gayleen's mental health issues and limiting the children's contact with Mr. Noble.

{¶4} The trial court conducted an evidentiary hearing on the Agency's motion and heard the testimony from numerous witnesses. Based on the evidence submitted, the trial court determined that there were serious concerns with respect to Gayleen's mental health and concluded it was in the children's best interest to remain in the temporary custody of Cristen and Chad. Accordingly, in its April 2, 2014 judgment entry, the trial court granted the Agency's motion to designate Cristen and Chad as the children's temporary legal custodians. Gayleen was granted parenting time as approved and arranged by the Agency. The trial court

also found that the Agency had made reasonable efforts to prevent the removal and/or to return the children to their home with Gayleen. The trial court further ordered Gayleen pay the sum of $1,100.00 per month to the Agency to be distributed to Cristen and Chad for the children's support, which was approximately half the amount of the social security death benefits paid to Gayleen on the children's behalves as a result of their father's death in 2006. The trial court permitted Gayleen to keep the other half of the benefits to maintain her household while the case was ongoing. In addition, Gayleen was ordered to complete mental health and substance abuse assessments and to submit to a psychological evaluation.

{¶5} On April 9, 2014, the trial court held an adjudicatory hearing on the complaints filed by the Agency and heard the testimony of several witnesses. The trial court found by clear and convincing evidence the children to be dependent pursuant to R.C. 2151.04(B) and (C). The record indicates that at this time Gayleen had not complied with any of the case plan objectives addressing her mental health and continued to maintain contact with Mr. Noble.

{¶6} On April 23, 2014, the GAL filed his report recommending the children remain in the temporary legal custody of Cristen and Chad. He also stated reunification should be considered delete if Gayleen took the appropriate

steps to address her mental health issues and terminated her relationship with Mr. Noble.

{¶7} On May 14, 2014, the trial court held a dispositional hearing where the testimony of several witnesses was presented. At the conclusion of the evidence, the trial court informed Gayleen that she needed to address her mental health issues before it would consider reunification. Accordingly, in its May 16, 2014 judgment entry, the trial court continued the designation of Cristen and Chad as the children's temporary legal custodians and awarded Gayleen parenting time as arranged by the Agency. The trial court also approved the Agency's case plan and the objectives addressing the concerns with Gayleen's mental health and plans for treatment. The trial court further found that the Agency continued to use reasonable efforts to prevent the removal and/or to return the children to their home with Gayleen. Specifically, the trial court noted the Agency had made the appropriate referrals for Gayleen and had arranged to pay the expense of her initial psychological evaluation.

{¶8} On May 27, 2014, Gayleen completed a psychological evaluation. In his forensic opinion, the reviewing psychologist found that Gayleen suffered from "significant mental health problems primarily in the form of difficulties with boundaries, relationships, and emotional regulation." (Hrinko Rpt. June 17, 2014 at 10). He further concluded that Gayleen had "significant problems being able to

recognize her limitations, her contributions to the difficulties she has experienced, and persists in blaming others inappropriately." (Id.). The psychologist opined that "[t]hese qualities have made it difficult for [Gayleen] to be able to establish and maintain healthy, supportive relationships instead resulting in her clinging to inappropriate relationships, as evidenced by her first marriage and her current relationship with [Mr. Noble], at the expense of the stability of those around her." (Id.). He recommended that Gayleen engage in intensive individual therapy and be seen by a psychiatrist "to evaluate the possibility she could benefit from psychotropic medications." (Id.).

{¶9} On August 7, 2014, Gayleen filed a "Motion for Reallocation of Parental Rights and Responsibilities and to Terminate Legal Custody."

{¶10} The trial court held an evidentiary hearing on Gayleen's motion where several witnesses testified. The testimony revealed that even though Gayleen appeared to have terminated her relationship with Mr. Noble, she had failed to take the steps necessary to complete the objectives in the case plan addressing her mental health. The evidence indicated that Gayleen had completed the psychological evaluation but had only sporadically attended scheduled counseling sessions. Gayleen had also expressed her resistance to completing a psychiatric evaluation based on her belief one was not warranted.

{¶11} On the record after hearing the evidence, the trial court overruled Gayleen's motion for custody. The trial court attempted to impress upon Gayleen the imperative nature of her compliance with the case plan objectives addressing her mental health to facilitate the reunification with her minor children.

{¶12} On April 6, 2015, the Agency filed a "Motion for Order Pursuant to Sections 2151.353 and 2151.42," requesting the trial court designate Cristen and Chad as the children's legal custodians. As a basis for the motion, the Agency argued Gayleen had failed to remedy the conditions causing the children's removal from her home—i.e., her untreated mental health issues which impaired her ability to parent the children and her continued contact with Mr. Noble.

{¶13} On May 28, 2015, Gayleen filed a second "Motion for Reallocation of Parental Rights and Responsibilities and to Terminate Legal Custody." In her motion, Gayleen claimed that she had substantially complied with the case plan objectives but could not complete the psychiatric evaluation due to "reasons beyond her control." (Doc. No. 104).

{¶14} On July 9, 2015, the trial court conducted a hearing on both the Agency's and Gayleen's motion for custody. Several witnesses testified, including the Agency's ongoing caseworker, the GAL, Cristen and Chad, and Gayleen. The trial court also conducted an in-camera interview with the children. At the conclusion of the evidence, the trial court announced its decision to award

legal custody of BP(1) and BP(2) to Cristen and Chad. Much of the testimony focused on Gayleen's lack of effort in complying with the case plan objectives. The trial court then made its findings on the record that it was in the children's best interest to designate Cristen and Chad as their legal custodians.

{¶15} In its July 10, 2015 judgment entries, the trial court journalized its decision to overrule Gayleen's motion for custody and to grant the Agency's motion designating Cristen and Chad as the legal custodians of BP(1) and BP(2). The trial court further found that the Agency had made reasonable efforts towards reunification throughout the case by attempting to assist Gayleen with completing the case plan objectives. The trial court also terminated Gayleen's right to receive any social security death benefits distributed on the children's behalves.

{¶16} Gayleen filed this appeal, asserting the following assignments of error.

### ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT'S DECISION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. APPELLEE DID NOT PROVE BY CLEAR AND CONVINCING EVIDENCE THAT THE COURT SHOULD GRANT ITS MOTION TO GIVE LEGAL CUSTODY OF THE MINOR CHILDREN TO APPELLANT'S OLDER DAUGHTER AND SON-IN-LAW.**

### ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT ERRED IN GRANTING THE MOTION FOR CUSTODY WHEN IT PRIMARILY FOCUSED ON APPELLANT'S MENTAL HEALTH AND RELIED ON THAT**

**AS THE BASIS FOR DEPRIVING APPELLANT CUSTODY OF HER MINOR CHILDREN.**

**ASSIGNMENT OF ERROR NO. III**

**THE TRIAL COURT ERRED IN FINDING APPELLEE USED REASONABLE EFFORTS FOR REUNIFICATION THROUGHOUT THE CASE.**

*Discussion*

*First and Second Assignments of Error*

**{¶17}** Gayleen's first and second assignments of error address the evidence relied upon by the trial court to overrule her motion for custody and to grant the Agency's motion to designate Cristen and Chad as the children's legal custodians. Due to the fact these assignments of error are intertwined, we elect to address them together.

*Evidence Supporting the Trial Court's Decision*

**{¶18}** At the outset we note that the award of legal custody is "not as drastic a remedy as permanent custody." *In re L.D.*, 10th Dist. No. 12AP-985, 2013-Ohio-3214, ¶ 7. *See also In re N.F.*, 10th Dist. No. 08AP–1038, 2009-Ohio-2986, ¶ 9. This is because the award of legal custody does not divest parents of their residual parental rights, privileges, and responsibilities. *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, ¶ 17. Since the granting of legal custody does not divest a parent of his or her fundamental parental rights, the parent can generally petition the court for a custody modification in the future. *In re L.D.* at ¶ 7.

{¶19} In such a case, a parent's right to regain custody is not permanently foreclosed. *In re M.J.M.*, 8th Dist. Cuyahoga No. 94130, 2010-Ohio-1674, ¶ 12. For this reason, unlike in a permanent custody proceeding where a juvenile court's standard of review is by clear and convincing evidence, the standard the trial court uses in making its determination in a legal custody proceeding is the less restrictive "preponderance of the evidence." *Id*. at ¶ 9, citing *In re Nice*, 141 Ohio App.3d 445, 455 (7th Dist.2001). "Preponderance of the evidence" means evidence that is more probable, more persuasive, or of greater probative value. *In re C.V.M.*, 8th Dist. Cuyahoga No. 98340, 2012-Ohio-5514, ¶ 7. In a dispositional hearing involving legal custody, the focus is on the best interest of the child. *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191; *In re P.S.*, 5th Dist. No.2012CA00007, 2012-Ohio-3431.

{¶20} In considering a disposition of legal custody, R.C. 2151.353(A)(3) does not list specific factors a court should consider in deciding what is in the child's best interest. *See In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23, citing *In re Fulton*, 12th Dist. Butler No. CA2002-09-236, 2003-Ohio-5984, ¶ 11. Although there is no "specific test or set of criteria" that must be followed in determining what is in a child's best interest in a legal custody case, other appellate courts have held that the R.C. 2151.414(D) factors may be "instructive." *See, e.g.*, *In re Howland Children*, 5th Dist. Stark No. 2015CA00113, 2015-Ohio-

3862, ¶ 7; *In re D.T.*, 8th Dist. Cuyahoga Nos. 100970, 100971, 2014-Ohio-4818, ¶ 20.  These factors include: the interaction of the child with the child's parents, relatives and caregivers; the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; the custodial history of the child; and the child's need for a legally secure permanent placement.  R.C. 2151.414(D).

{¶21} The trial court's decision to grant or deny a motion for legal custody is within its sound discretion and will not be reversed absent an abuse of discretion. *In re M.S.*, 9th Dist. Summit No. 22158, 2005-Ohio-10, ¶ 11.  An abuse of discretion implies that the court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶22} The record establishes that there were two primary concerns underlying the initial removal of BP(1) and BP(2) from Gayleen's home.  The first was Gayleen's tumultuous relationship with Mr. Noble and the second involved concerns regarding Gayleen's mental health.  The Agency included objectives in its case plan to assist Gayleen with remedying these issues, in particular it attempted to provide Gayleen with services and support to seek counseling and treatment so she could be reunified with BP(1) and BP(2).

{¶23} With regard to her mental health, the record demonstrates that the Agency's primary concern stemmed from a pattern of erratic behavior and unstable temperament exhibited by Gayleen.  In its judgment entry adjudicating

BP(1) and BP(2) dependent, the trial court discussed testimony from law enforcement officers with the Bellefontaine Police Department recounting their numerous contacts with Gayleen and the family. The nature of these calls, which were made by Gayleen, included her concerns regarding thefts and possible burglaries based upon her belief that someone was watching her home, vandalizing her home, and entering her home to remove or move her possessions or to leave suspicious items. There were also accounts of Gayleen turning off her cell phone and television out of fear she was under someone's surveillance. Notably, none of these claims were ever substantiated by law enforcement.

{¶24} Gayleen's long-time counselor also provided testimony discussing Gayleen's diagnosis of Anxiety Disorder, Post-Traumatic Stress Disorder, and Borderline Personality Disorder. Her counselor further stressed that Gayleen was in need of extensive counseling to address her ongoing mental health issues. BP(1) and BP(2) also reported similar bizarre behavior by Gayleen to service providers. Each girl independently relayed repeated accounts of argument and conflict with Gayleen and provided specific examples of Gayleen "getting in their face" in an effort to provoke them to hit her so she could send them to the juvenile detention center.

{¶25} The record demonstrates that throughout the case, Gayleen showed reluctance in taking the necessary steps to address the concerns prompting the

children's removal from her home. Nearly five months passed after the initiation of the case before Gayleen was willing to complete the first step of a psychological evaluation. Notably, Gayleen attributed the delay in achieving this objective to her claim that someone entered her home and removed pages from her phone book with the listings for local psychologists in an attempt to thwart her compliance with the case plan. The psychological assessment was completed only after the Agency made the referral and paid for the evaluation.

{¶26} The psychologist recommended that Gayleen be evaluated by a psychiatrist and begin "intensive" individual therapy and eventually participate in family therapy with BP(1) and BP(2). The primary goal of these recommendations was to assist Gayleen in recognizing the negative effects of her relationship with Mr. Noble and to help her repair her relationship with BP(1) and BP(2). However, months passed with Gayleen only sporadically attending counseling sessions and with Gayleen continuing to have contact with Mr. Noble. Gayleen was also adamant throughout the case about her resistance to taking any psychotropic medication which contributed to her refusal to be even evaluated by a psychiatrist. Notably, the case plan only required Gayleen to follow the treatment recommendations which included submitting to a psychiatric evaluation to explore the "possibility" of psychotropic medication. There was never any specific requirement in the case plan that Gayleen be placed on medication.

{¶27} Nevertheless, after almost eighteen months Gayleen feigned a willingness to complete the psychiatric evaluation on the stand at the final hearing. However, she blamed her noncompliance on the Agency for not finding her a psychiatrist who took her insurance. Testimony from the ongoing caseworker revealed that early on in the case the Agency had arranged for Gayleen to be seen by a local psychiatrist and she was put on a waitlist for evaluation. However, Gayleen told the service provider numerous times that she would refuse to take psychotropic medication if any were to be prescribed by the psychiatrist. As a result, she was placed as a low priority on the waitlist due to her preemptive unwillingness to cooperate with potential treatment options.

{¶28} It should be noted that Gayleen focuses on this issue on appeal by arguing that the trial court's decision was erroneous due to her claim that she "completed" all the case plan objectives with the exception of submitting to a psychiatric evaluation. However, even though Gayleen appeared to heed the trial court's warnings to show compliance with the case plan objectives regarding her mental health concerns, there were signs that Gayleen's genuine willingness to address the situation was questionable. Gayleen's counselor reported to the GAL that Gayleen was often very agitated at the therapy sessions. The counselor described Gayleen as only focused on "venting" during the sessions and seldom taking her advice, therefore undermining the effectiveness of the treatment.

Gayleen also continued to deny that she suffered from any mental health issues, despite at least two professional opinions to the contrary. The counselor also confirmed that Gayleen continued to have contact with Mr. Noble which also impeded her progress with treatment.

{¶29} The ongoing case worker provided similar testimony at the final hearing regarding his interactions with Gayleen. He described conversations with Gayleen which revolved around her discussing incidents that occurred ten years ago and were of no consequence to the case. He recalled that in these conversations Gayleen often characterized herself as a perpetual victim. He also recalled Gayleen admitting to seeing Mr. Noble in May of 2015, two months before the final hearing, and acknowledging the negative impact he had on her. However, Gayleen told the caseworker that she continued the relationship simply because she was lonely. (7/9/15 Hrg., Tr. at 39).

{¶30} Throughout the case there was also evidence that the conduct underpinning the concerns with Gayleen's mental health had appeared to escalate rather than ameliorate. According to reports from law enforcement, the ongoing caseworker, the GAL, and her counselor, Gayleen continued to exhibit a pattern of bizarre behavior which appeared to be premised on her belief that someone was breaking into her home and/or car to move or steal her possessions or to leave threatening items. She also made accusations that someone had entered her home

while she slept and shaved her eyebrow and dyed her hair. The children reported to the GAL and the caseworker that, despite the passage of time and their removal from her home, during visitations Gayleen continued to make paranoid comments, attempted to provoke them and threatened them with juvenile detention. Several months later just before the final hearing in this case, Gayleen purchased an ad in the local newspaper offering a $5,000.00 reward for information leading to the identification and arrest of the individual she believed was breaking into her home.

{¶31} Contrary to Gayleen's claims on appeal, the evidence and the trial court's decision was not solely focused on her mental health issues. During the approximately eighteen-month period the case was pending, the record reveals that Gayleen demonstrated a pattern of placing the case as a low priority to other things in her life. Gayleen's attorney twice filed a motion to withdraw from her representation citing Gayleen's refusal to meet with her and generally being uncooperative in assisting her with the case.[1] Counsel informed the court on the record that Gayleen claimed not to have time to meet with her. Counsel also reported exchanges with Gayleen during which Gayleen commanded counsel to do things that were ethically suspect and when counsel refused Gayleen responded by yelling at counsel telling her that she must do what Gayleen says as the client.

---

[1] Notably, one of these motions was made at the beginning of the final hearing on the Agency's Motion for Legal Custody. Gayleen's counsel expressed exasperation with her efforts to get Gayleen to participate in the case. She claimed that every conversation with Gayleen deteriorated into Gayleen screaming at her over the phone. Counsel agreed to proceed with the hearing at Gayleen's behest provided that her concerns were placed on the record.

{¶32} With regard to Gayleen's visitations, the record indicated that Gayleen had weekly unsupervised visitations with the girls for a few hours a week. There was testimony from the caseworker and the GAL, which were corroborated by reports from BP(1) and BP(2), that Gayleen did not take advantage of her opportunities to visit with the girls and often cut visitations short or cancelled them to meet with friends or to attend exercise classes. The children reported that in some instances they were en route to a visitation and received a phone call from Gayleen cancelling at the last minute. The girls expressed to the GAL that this conduct made them feel like Gayleen did not value her time with them. The caseworker also stated that he had difficulty meeting with Gayleen to complete monthly home visits and she continually gave excuses that she was too busy to meet. He also testified to BP(1) and BP(2) expressing their beliefs that Gayleen prioritized her relationship with Mr. Noble higher than spending time with them.

{¶33} The GAL, who was assigned to the case from the beginning and who had numerous contacts with Gayleen and the children, observed the apparent discrepancy with Gayleen's ability to prioritize her life to attend school and earn a degree during the eighteen-months that the case was pending with her inability to find the time to meet with her attorney, to show meaningful compliance with the case plan objectives, and to regularly exercise visitation with BP(1) and BP(2). Specifically, the GAL characterized Gayleen's noncompliance with the case plan

as a lack of progress rather than a lack of treatment, and noted that the "treatment is only as good as the client's willingness." (7/9/15 Hrg., Tr. at 135).

{¶34} The trial court echoed the GAL's observation when it made its findings of fact on the record after the presentation of the evidence at the final hearing. Specifically, the trial court stated that it did not appear BP(1) and BP(2) were a priority in Gayleen's life and noted it was "appalled" that Gayleen "did not bend over backwards to assist her attorney" in preparing the case. (7/9/15 Hrg., Tr. at 149-50).

{¶35} With respect to the children's placement with Cristen and Chad the evidence established that the girls were thriving in their home. The record further demonstrated that Cristen and Chad complied with the case plan objectives and assisted the children in attending biweekly counseling sessions. At the time of the final hearing, the children were approaching their seventeenth birthdays and able to drive themselves to visitations with Gayleen. Both girls expressed a desire to remain with Cristen and Chad and to continue to see Gayleen on a regular basis. Specifically, they relayed to the caseworker that they did not "trust they would be safe or remain safe if they were returned to their mother." (7/9/15 Hrg., Tr. at 44). As a result, BP(1) and BP(2) indicated to individuals involved in the case that they wanted to continue visitations for a few hours a week and were not opposed to

overnight visits if they could have a car available to them so that they could leave Gayleen's home if any issues arose.

**{¶36}** Even though Cristen admitted to having a strained mother-daughter relationship with Gayleen, she repeatedly stated throughout the case that she believed it was important to foster BP(1)'s and BP(2)'s relationship with Gayleen. The record demonstrated that Cristen followed through with this sentiment by ensuring the girls arrived at their visitations with Gayleen. As previously discussed, it was Gayleen who was inconsistent with exercising her visitations with the girls. Notably, Gayleen expressed no concerns with Cristen facilitating her visitations with BP(1) and BP(2) without the involvement of Children Services or a court order. Moreover, she acknowledged that she and Cristen would be capable of creating a visitation schedule despite their differences.

**{¶37}** In sum, the evidence before the trial court established that BP(1) and BP(2) were in need of a legally secure permanent placement and that Gayleen was not able to provide them with a stable home. Several witnesses testified about the suitability of Cristen and Chad as legal custodians and their willingness to provide the children with a permanent home. Consequently, we find that the trial court reasonably concluded, by a preponderance of the evidence, that it was in the best interests of the children to be placed in the legal custody of their sister and brother-in-law. Accordingly, we cannot find that the trial court abused its

discretion in granting the Agency's motion nor can we find its decision to be against the weight of the evidence. Gayleen's first and second assignments of error are overruled.

*Third Assignment of Error*

{¶38} In her third assignment of error, Gayleen asserts the trial court erred in finding that the Agency made reasonable efforts to reunify her with BP(1) and BP(2).

{¶39} Section 2151.419(A)(1) of the Revised Code governs reasonable efforts by a public children services agency "to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." The agency has the burden of proving that it has made those reasonable efforts.

{¶40} " 'Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.' " *In re H.M.K.*, 3d Dist. Wyandot Nos. 16-12-15 and 16-12-16, 2013-Ohio-4317, ¶ 95, quoting *In re D.A.*, 6th Dist. Lucas No. L–11–1197, 2012–Ohio–1104, ¶ 30. " 'Reasonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." *Id.*, quoting *In re M.A.P.*, 12th Dist. Butler Nos. CA2012-

08-164 and CA2012-08-165, 2013-Ohio-655, ¶ 47.  " 'Nevertheless, the issue is not whether there was anything more that [the agency] could have done, but whether the [agency's] case planning and efforts were reasonable and diligent under the circumstances of this case.' " *In re A.M.A.*, 3d Dist. Crawford No. 3-13-02, 2013-Ohio-3779, ¶ 29, quoting *In re Leveck*, 3d Dist. Hancock Nos. 5-02-52, 5-02-53, and 5-02-54, 2003-Ohio-1269, ¶ 10. "We also note that the statute provides that in determining whether reasonable efforts were made, the child's health and safety is paramount." *Id.*, citing R.C. 2151.419(A)(1).

{¶41} In the instant case, the trial court made numerous findings throughout the case after pertinent hearings that the Agency had made reasonable efforts to prevent the removal and/or to return the children to their home with Gayleen. Specifically, the trial court found that the Agency made the appropriate referrals for Gayleen, paid the expense of her psychological evaluation, and assisted the family with scheduling parenting time and visitation.  Nevertheless, it was Gayleen's conduct and unwillingness to complete the case plan and to take the appropriate steps to alleviate the concerns causing the removal of the children from her home which led to the trial court's determination that granting legal custody to Cristen and Chad was in the children's best interest.  Based upon our review, we conclude that the record supports the trial court's findings that the

Agency fulfilled its duty to make reasonable efforts toward reunification. Accordingly, we overrule Gayleen's third assignment of error.

{¶42} For all these reasons, the judgments of the Logan County Family Court are affirmed.

***Judgments Affirmed***

**ROGERS, P.J. and PRESTON, J., concur.**

**/jlr**