**[Cite as *In re J.C.*, 2021-Ohio-1453.]**

**IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
HENRY COUNTY**

IN RE:                                                                      CASE NO. 7-20-10

   J.C.,

A DEPENDENT CHILD.

                                                                          **O P I N I O N**

[MICAILA C. - APPELLANT]

Appeal from Henry County Common Pleas Court
Juvenile Division
Trial Court No. 20193013

**Judgment Affirmed**

Date of Decision:  April 26, 2021

**APPEARANCES:**

   *Autumn D. Adams* **for Appellant**

   *Katie L. Nelson* **for Appellee, Henry County Job and Family Services**

**WILLAMOWSKI, P.J.**

{¶1} Respondent-appellant Micaila C. ("Micaila") brings this appeal from the judgment of the Court of Common Pleas of Henry County, Juvenile Division, granting legal custody of J.C. to the paternal aunt, Jennifer N. ("Jennifer"). On appeal, Micaila claims that the trial court erred by failing to extend the temporary custody of the child when the failure was against the manifest weight of the evidence. For the reasons set forth below, the judgment is affirmed.

{¶2} J.C. was born to Micaila in July 2018. Doc. 1. On July 30, 2019, the Henry County Department of Job and Family Services ("the Agency") filed a complaint alleging that J.C. was a dependent child and requesting temporary custody of J.C. Doc. 1. The basis for this claim was that J.C. was homeless and that Micaila allegedly suffered from mental health issues. Doc. 1. An adjudication hearing was held, at which Micaila admitted that J.C. was a dependent child. Doc. 13. At the disposition hearing, the trial court awarded temporary custody of J.C. to the Agency. Doc. 14. The Agency subsequently placed J.C. with Jennifer. November 18, 2019, Case Plan. The Agency also set forth a case plan requiring Micaila to 1) receive a psychological evaluation and comply with any recommendations; 2) submit to random drug and alcohol screens; 3) seek and obtain housing; and 4) maintain stable employment. October 16, 2019, Case Plan.

{¶3} On March 4, 2020, Jennifer filed a motion for legal custody of J.C. Doc. 30. The Agency filed a motion in support of Jennifer's motion on August 27, 2020.

Doc. 46. A hearing was held on the motion on September 25, 2020. Doc. 58. Following the hearing, the trial court granted Jennifer's motion and awarded legal custody of J.C. to her. Doc. 58. Micaila filed a timely notice of appeal from this judgment and on appeal raises the following assignments of error.

**First Assignment of Error**

**The trial court abused its discretion by not extending the period of temporary custody to [the Agency] when [Micaila] made significant progress on case plan services.**

**Second Assignment of Error**

**The trial court's failure to extend the case for six (6) months was against the manifest weight of the evidence.**

Both assignments of error argue that the trial court erred in granting the Agency's motion to award legal custody of the children to Jennifer instead of continuing the temporary custody. Thus, we will address them together.

*Legal Standard*

{¶4} At the outset, this court notes that this is not a case involving the granting of permanent custody to the Agency, but is instead a grant of legal custody to a third party. Where permanent custody would legally terminate all parental rights, legal custody does not. R.C. 2151.011. "'Legal custody' means a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter,

education, and medical care, all subject to any residual parental rights, privileges, and responsibilities." R.C. 2151.011(B)(21). In other words, legal custody does not divest parents of all their rights and either parent may petition the court in the future for a modification of custody. *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, ¶ 17, 843 N.E.2d 1188. Because the parent's right to regain custody is not permanently foreclosed, the standard used by the trial court in making a decision in a legal custody proceeding is merely preponderance of the evidence. *In re B.P.*, 3d Dist. Logan Nos. 8-15-07, 8-15-08, 2015-Ohio-5445, ¶ 19.

> **Preponderance of the evidence is the greater weight of the evidence; that is, evidence that you believe because it outweighs in your mind the evidence opposed to it. A preponderance means evidence that is more probable, more persuasive, or of greater probative value.**

2 CR Ohio Jury Instruction 207.21. "In a dispositional hearing involving legal custody, the focus is on the best interest of the child." *In re B.P, supra* at ¶ 19.

{¶5} R.C. 2151.353 provides that one disposition a trial court may make for a child that has been adjudicated as dependent is to award legal custody of the child to any person who is identified as a proposed legal custodian and who completes the appropriate statement. R.C. 2151.353(A)(3). The statute does not set forth specific factors to be considered in making the determination of best interest of the child. *In re B.P., supra*. However, the factors set forth in R.C. 2151.414(D) for determining whether a grant of permanent custody is in the best interest of the child have been held to be "instructive" as to an award of legal custody. *Id.* These factors

include the interaction of the child with the various parties, the wishes of the child as told by the child or the GAL, the custodial history of the child, and the child's need for a legally secure placement. R.C. 2151.414(D). A decision reached by a trial court concerning a motion for legal custody is within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *In re B.P., supra* at ¶ 21.

*Evidence Presented*

{¶6} A review of the record in this case shows that the following testimony was presented at the hearing. Jennifer testified that the Agency had placed J.C. with her in October of 2019. Tr. 18. Before then Jennifer babysat for J.C. many times at the request of Micaila. Tr. 19-21. Jennifer indicated that J.C. has thrived in her care. Tr. 23. When J.C. first came, he had no regular schedule and appeared to be afraid of men. Tr. 23. J.C. was put on a regular schedule and is no longer afraid of people. Tr. 23. Jennifer also indicated that Micaila had missed many visits with J.C. and she brought strangers with her to J.C.'s birthday party in August. Tr. 24. According to Jennifer, Micaila has a history of making things up and fails to take responsibility for her actions. Tr. 25-26. Jennifer testified that Micaila refuses to have contact with her, including refusing to visit J.C. at their home rather than at the Agency. Tr. 26-27. Micaila has refused to give her a phone number or address and had blocked Jennifer on Facebook, so Jennifer has no way of sharing J.C.'s accomplishments with her. Tr. 27-28. Jennifer testified that she was willingly

accepting the responsibility for J.C. and would work with Micaila to insure visits occurred. Tr. 28-29.

{¶7} On cross-examination, Jennifer admitted that she had never asked Micaila for her address. Tr. 31. Jennifer also admitted that J.C. had been in other placements before coming to her home, so the lack of schedule may have been a result of that rather than being with Micaila. Tr. 34. The contact that did come from Micaila was addressed to Jennifer's fiance. Tr. 36.

{¶8} Randy T. ("Randy") testified that he is engaged to Jennifer and lives in the same home with her and J.C. Tr. 39. According to Randy, J.C. is doing well but he feels bad restricting Micaila to visits at the Agency only, so he and Jennifer arranged some visits at the park. Tr. 41. Micaila was invited to J.C.'s birthday party, but she brought some additional people who she claimed were his grandparents even though they were not. Tr. 41-42. When Randy and Jennifer brought J.C. to their home, Randy had a good relationship with Micaila and he was hoping J.C. could be returned. Tr. 42. Over time though, Micaila started sending him threatening text messages. Tr. 43-44. The messages started with her accusing Randy and Jennifer of trying to steal J.C. Tr. 44. In Randy's opinion, J.C.'s best interests would be served by leaving J.C. with Randy and Jennifer. Tr. 48. Up until a week before the hearing, Micaila was able to contact Randy whenever she wanted, but when her messages became harassing and threatening, he blocked her. Tr. 48-49.

{¶9} Thomas Knox ("Knox") testified that he rented a house to a third party, who moved in with her son and his girlfriend. Tr. 53. When the rent was not paid for several months, he evicted the people living there. Tr. 53. Instead of moving out, they moved into the in-law suite above the garage. Tr. 53. One of the people who was evicted was known to Knox as Maria, but was identified by him as Micaila. Tr. 54-55. Micaila, under the name Maria, was included in the eviction. Tr. 55. Eventually, Micaila, along with the others, were removed from the property all together. Tr. 55. According to Knox, Micaila had not lived at the property since before August 4, 2020. Tr. 67.

{¶10} Bayli Geiser ("Geiser") is an ongoing caseworker at the Agency. Tr. 74. She took over J.C.'s case in September of 2019. Tr. 74. According to Geiser, the Agency had temporary custody of J.C. since July of 2019. Tr. 75. Originally, J.C. was placed with his grandparents, but was moved to Jennifer's home when his grandfather started having health issues. Tr. 76. A few days before the hearing, Geiser conducted a home visit at Jennifer's home and found J.C. to be doing "great". Tr. 76-77. The home was appropriately baby-proofed. Tr. 77. Geiser testified that Micaila would cancel a few visits, then attend really well for a while, but she generally attended visits. Tr. 78. One issue with Micaila is that she can be nice sometimes, but generally is harassing and threatening. Tr. 79-80. Geiser also testified that Micaila has issues with maintaining employment. Tr. 84-86. At the time of the hearing, Geiser did not know where Micaila was living or if she was

employed. Tr. 86. Micaila had served a 30 day jail term for telecommunication harassment and driving under suspension. Tr. 86. According to Geiser, Micaila's mood changes easily and she struggles with depression and anxiety. Tr. 88. The mental health assessment recommended that Micaila have "consistent, individual mental health therapy" before being allowed unsupervised visitation. Tr. 88. Although Micaila attended counseling consistently starting around January of 2020, she stopped attending regularly in June of 2020. Tr. 89. Geiser did not know if Micaila was continuing her counseling at the time of the hearing. Tr. 90. In Geiser's opinion, J.C.'s best interests would be served by granting legal custody to Jennifer. Tr. 90.

{¶11} On cross-examination, Geiser testified that Micaila did ask for additional visitation, but the Agency did not have the resources to fulfill the request. Tr. 92-94. Then in-person visits were stopped for a couple of months due to COVID restrictions. Geiser admitted that from her observations during visits, she had no concerns about how Micaila treated J.C. and that she acted appropriately with him. Tr. 95-96. Geiser noted that Micaila clearly loved J.C. Tr. 96. Geiser also admitted that Micaila is able to obtain employment, but stated that she does not seem to be able to maintain employment. Tr. 98.

{¶12} Michelle Snyder ("Snyder") testified that she was the CASA volunteer appointed to this case. Tr. 103. Snyder indicated that she had been having monthly home visits with Jennifer and Randy regarding J.C. via zoom due to COVID. Tr.

104. According to Snyder, J.C. was thriving under the care of Jennifer and Randy and their home was very suitable. Tr. 104. At the beginning of the case, Micaila worked with Snyder, but later she became hostile. Tr. 105. Although Micaila would obtain employment and housing, she would eventually lose them. Tr. 105. Snyder did not know where Micaila was living at the time of the hearing. Tr. 107. Sndyer also testified that Micaila, when asked a question, would go into tangential rants about how the Agency and everyone was trying to steal her child. Tr. 111. According to Snyder, Micaila often would lie to her. Tr. 112. Although Snyder was not concerned with how Micaila treated J.C. during visits, she recommended that custody be placed with Jennifer and Randy. Tr. 113.

{¶13} John B. ("John") testified that he is J.C.'s father. Tr. 120. At the time of the hearing, he was an inmate at Richland Correctional Facility. Tr. 120. In John's opinion, J.C. was in a "fantastic home" where his needs were met. Tr. 120. John indicated that neither he nor Micaila could provide a suitable home at that time, so he thought it was in J.C.'s best interest to remain with Jennifer. Tr. 121.

{¶14} Micaila testified that she had lived in her car with J.C. for two days which caused this case to be started. Tr. 124-25. When she needed help, she asked Jennifer to take J.C. for a short time and Jennifer agreed to do so. Tr. 125. At the time of the hearing, Micaila testified that she was employed full-time at "Genacross Lutheran Home". Tr. 126-27. Micaila also testified that she had been living at her current address for close to two months. Tr. 128. She is living with her boyfriend,

his father, and his step-mother. Tr. 129. Micaila asked Geiser to conduct a home visit, but it was denied due to COVID. Micaila then cancelled a visitation because if COVID was so bad as to prevent the home visit, it should also cancel the visit rather than risk J.C.'s health. Tr. 129. Micaila indicated that the home where they were living was a three bedroom trailer, so J.C. would be able to have his own room. Tr. 130. Micaila and her boyfriend were discussing purchasing the trailer at the end of the year. Tr. 131. Micaila admitted that she had just completed 30 days in jail for driving under suspension, but claimed she only did it to get to orientation for her job. Tr. 132. She claims that all she needs to do to get her license back is to pay the fines for the suspension she received in Texas. Tr. 132. Micaila denied that she was staying at Knox's home without permission. Tr. 135. Micaila also testified that in the time the case was active, she had many different residences and many different jobs. Tr. 136-45. Specifically, she admitted that she had four different residences and five different jobs. Tr. 215. When asked about counseling, Micaila indicated that she was consistent with seeing her counselor unless she was sick or had to work. Tr. 146. Micaila admitted that she had not had a session since July of 2020. Tr. 147. In her opinion, Micaila did not think she really needed therapy. Tr. 220. Micaila also admitted that she had not seen J.C. since his last birthday party. Tr. 153. When she asked for visits to resume, Geiser told Micaila that Jennifer and Randy did not want to conduct video visits to allow Micaila to see J.C. Tr. 156.

Micaila was concerned that if Jennifer and Randy were given custody, they would not allow her to visit with J.C. Tr. 176.

{¶15} Christa Sweeney ("Sweeney") testified that Micaila was dating her stepson for approximately a year. Tr. 228. Micaila moved in with Sweeney in July of 2020. Tr. 229. Sweeney testified that she and her husband were planning on selling the home to her stepson and Micaila once Sweeney and her husband move to a new home. Tr. 230. Sweeney saw no reasons Micaila could not parent J.C. and that the home was suitable for him. Tr. 231. The home is a three bedroom, two bathroom one with one of the bedrooms being available for J.C. Tr. 231. J.C. would be welcome in the home. Tr. 233.

{¶16} Once the trial was completed, the trial court issued its opinion and noted the following case history and testimony. J.C. had been placed in the temporary custody of the Agency on July 31, 2019. Doc. 58 at 2. Pursuant to the case plan, Micaila was required to maintain employment and housing. Doc. 58 at 3. Micaila was also to obtain a psychological evaluation and follow the recommendations. Doc. 58 at 3. The GAL and the psychologist both filed reports indicating they had concerns with Micaila's mental health, her failure to maintain housing and employment, and both recommended that Micaila's visits with J.C. continue to be supervised. Doc. 58 at 3-4. At a dispositional review hearing in November 2019, Micaila was ordered to re-enroll in counseling and obtain an evaluation to determine the need for medication. Doc. 58 at 4. Another

dispositional review was held on December 20, 2019, and the trial court had ordered Micaila to comploy with the case plan, including maintaining contact with the GAL and the caseworker. Doc. 58 at 5. During the administrative review dated January 21, 2020, the Agency noted that Micaila had missed several counseling appointments and was unsuccessfully discharged from services due to noncompliance. Doc. 58 at 5. It was also noted that she was continuing to struggle with maintaining housing and employment and was being charged with telecommunication harassment against the Agency which resulted in a no contact order that interfered with her ability to attend supervised visitations at the Agency. Doc. 58 at 5. Jennifer was then supervising the visits, which Micaila refused to attend due to her distrust of Jennifer. Doc. 58 at 5. After the February 11, 2020 dispositional review, the trial court noted that Micaila was not compliant with counseling and was still having issues maintaining employment. Doc. 58 at 5. The May 5, 2020 review showed that Micaila was making some progress as she had maintained employment and housing for a couple months and had been consistent with counseling for a few months. Doc. 58 at 6. In July of 2020, the Agency indicated that it was not requesting an extension because Micaila was losing her housing, had lost her employment, and was non-compliant with counseling. Doc. 58 at 6. The semi-annual review filed on July 24, 2020 indicated that Micaila had made insufficient progress for all of the reasons set forth above. Doc. 58 at 6. Micaila had repeatedly refused to have parenting time with J.C. supervised by

Jennifer at the park since June. Doc. 58 at 8. Due to threatening comments made by Micaila to Jennifer and Randy, they were hesitant to allow parenting time at their home and wanted it to be facilitated by the Agency. Doc. 58 at 8. Throughout the case, Micaila had no problem obtaining employment, but she had issues maintaining it for more than a couple of months. Doc. 58 at 12. Micaila has not updated the GAL on where she is living, working, or whether she is attending counseling despite having the phone number of the GAL. Doc. 58 at 12. The GAL also noted that Micaila has lied to her on several occasions about housing and employment. Doc. 58 at 12. The trial court noted that Micaila had admitted to being fired from multiple jobs in the past year. Doc. 58 at 15. Micaila had also admitted not engaging in counseling sessions since July 2020. Doc.58 at 15. Additionally, Micaila's record of phone calls showed seven calls ranging from 36 seconds to almost 10 minutes. Doc. 58 at 15. The trial court determined that these were not likely productive counseling sessions since they averaged less than 4 minutes. Doc. 58 at 15. Despite Micaila's complaints that Jennifer did not update her about J.C. enough, Micaila admitted that she had blocked Jennifer since July and Jennifer had no way to contact her. Doc. 58 at 17. The trial court was also concerned that Micaila's current boyfriend that she was living with and planning on buying a home with was only 17 at that time and Micaila was 24. Doc. 58 at 17.

{¶17} Based upon this testimony, the trial court made the following findings of fact. During the approximately 14 month pendency of the case, Micaila had six

different residential situations. Doc. 58 at 19. Micaila also had six different jobs during that time, being fired from four, laid off due to COVID from one, and the last being her current employment. Doc. 58 at 19. Micaila continues to have legal issues with suspended or stayed days in jail still active along with over $2,675 owed in fines and court costs. Doc. 58 at 19. Micaila failed to maintain necessary contact with the GAL, the caseworker and Jennifer. Doc. 58 at 20. Micaila did well while attending counseling, but she has not been consistent with attendance and has not obtained the evaluation for the purpose of determining whether medication is recommended as ordered by the trial court. Doc. 58 at 20. Although Micaila loves J.C. and wants him to be with her, "she has not made sufficient progress to do what is necessary to stabilize her life to have an appropriate home for [J.C.], or to undergo the counseling necessary for her mental health." Doc. 58 at 21. The trial court noted that it had considered the factors set forth in R.C. 3109.04(F) in determining the best interest of J.C. and set forth its findings as to the factors. Doc. 58 at 22-23. Based upon these findings, the trial court granted legal custody of J.C. to Jennifer.

*Analysis*

{¶18} In both assignments of error, Micaila argues that the trial court should have granted a six month extension of the case rather than granting legal custody to Jennifer. A temporary custody order terminates one year after the date the child was first placed into shelter care, except if a motion is filed to extend it. R.C. 2151.353(G). Additionally, a party can file a motion to terminate the order of

temporary custody. R.C. 2151.353(H). Although the case can be extended for an additional time, there is no requirement that the extension must occur and the determination as to whether the extension or termination is in the best interest of the child is left to the trial court's discretion. *Matter of C.K.*, 5th Dist. Muskingum No. CT2020-0027, 2020-Ohio-5437 ¶ 21. Thus, the decision will only be reversed if the decision is arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). "An abuse of discretion exists if the court's decision regarding the child's best interests is not supported by competent, credible evidence." *In re D.M.*, 1st Dist. Hamilton No. C-140648, 2015-Ohio-3853.

{¶19} Initially, this Court notes that no written motion to extend temporary custody of J.C. was filed by either the Agency or Micaila. Micaila's testimony showed that she wanted the trial court to terminate the case, but return J.C. to her custody. A review of the record shows that the findings of fact and conclusions of law made by the trial court are supported by competent, credible evidence. The trial court specifically pointed to specific testimony to support its findings and conclusions. Additionally, the trial court considered various factors in determining what was in the best interest of the child. Given the record before this court, we do not find that the trial court erred by failing to deny Jenifer's motion for legal custody, supported by the Agency, and the Agency's motion to terminate the case.

Case No. 7-20-10

{¶20} This leads to the question of whether the trial court's decision was against the manifest weight of the evidence. As noted above, the trial court's decision to grant legal custody to Jennifer was supported by a substantial amount of competent, credible evidence. Micaila repeatedly stopped cooperating with the case plan whenever she disagreed with Geiser. She showed the same attitude towards Jennifer and Randy. She would rather give up a visitation with J.C. than adjust her behavior to comply with the requests made. This same attitude is what led to numerous job losses. Although Micaila claims she has stable housing, her own testimony shows that does not appear to be the case as she has no legal right to her housing at this time and is just there at the good will of others. Likewise, she had only been at her current employment for approximately one month. Given the evidence before it, this Court does not find that the trial court lost its way or that a manifest injustice occurred.[1] The assignments of error are each overruled.

{¶21} Having found no prejudicial error in the particulars assigned and argued, the judgment of the Court of Common Pleas of Henry County, Juvenile Division is affirmed.

*Judgment Affirmed*

**MILLER and SHAW, J.J., concur.**

**/hls**

---

[1] Notably, the trial court even took additional steps to insure that Micaila had a path to receiving unsupervised visitations with J.C. if she took the required steps to control her mental health issues.