[Cite as *Randall E. v. Courtney B.*, 2025-Ohio-5376.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HENRY COUNTY

RANDALL SCOTT E.,

    PLAINTIFF-APPELLANT,

  v.

COURTNEY B.,

    DEFENDANT-APPELLEE,

  -And-

ROBERT B., ET AL.,

    THIRD-PARTY DEFENDANTS.

CASE NO. 7-25-04

OPINION AND
JUDGMENT ENTRY

Appeal from Henry County Common Pleas Court
Domestic Relations Division
Trial Court No. 22 DR 0019

**Judgment Affirmed**

Date of Decision: December 1, 2025

APPEARANCES:

    *Ian A. Weber* for Appellant

    *Stephen M. Szuch* for Appellee

**WALDICK, P.J.**

{**¶1**} Father-appellant, Randall Scott E. ("Father"), brings this appeal from the March 27, 2025, judgment of the Henry County Common Pleas Court, Domestic Relations Division, granting legal custody of the minor child GB-E to maternal grandparents-third party defendants, Robert and Luanne B. (collectively, "Grandparents"). On appeal, Father argues that the trial court's decision was against the manifest weight of the evidence. For the reasons that follow, we affirm the judgment of the trial court.

*Background*

{**¶2**} GB-E was born in August of 2021. She has been diagnosed with autism spectrum disorder and is nonverbal. Her parents are Randall E., Father, and Courtney B. ("Mother").

{**¶3**} In April of 2023, Father and Mother divorced pursuant to a consent divorce decree that included an agreed shared parenting plan.

{**¶4**} In June of 2023, less than two months after the divorce was finalized, the shared parenting plan was suspended and Father was named sole residential parent and legal custodian of GB-E. At the time, Mother had "relapsed" from her substance abuse treatment and she was not engaging with her mental health services.

{¶5} On January 1, 2024, an incident occurred at Father's home wherein he allegedly pointed a firearm at a "Door Dash" driver. The "Door Dash" driver called the police, and when the police arrived, Father's girlfriend ran out of the residence and had significant, fresh bruising on her face. During the course of this case, Father told multiple stories regarding how his girlfriend was injured, claiming it was from a car accident or an ATV accident. There was also a claim that she fell on a curb. On January 1, 2024, Father was arrested and charged with Aggravated Menacing, Domestic Violence, and Assault, all first degree misdemeanors. GB-E was not at home at the time of the incident as she was staying with her paternal grandfather.

{¶6} Grandparents learned of the charges against Father and on February 24, 2024, Grandparents filed a motion to intervene and a motion for legal custody of GB-E. On February 28, 2024, Grandparents filed an emergency motion for ex parte orders and other relief, detailing their concerns with, *inter alia*, the criminal charges against Father.

{¶7} Notably, Father had prior felony convictions in North Carolina related to drugs and larceny. He was therefore under a weapons disability from those convictions and was not permitted to possess a firearm. Father was charged with Having Weapons While Under Disability for his possession of a firearm during the January 1, 2024, incident, a third degree felony, and a warrant was issued for his arrest.

{¶8} An officer conducting surveillance on Father's residence served the warrant for his arrest. A subsequent search of Father's residence uncovered over $2,000 in currency, a scale with cocaine residue, another digital scale, and a significant amount of marijuana, which resulted in an indictment for Trafficking in Drugs and Possession of Controlled Substances, both fifth degree felonies.

{¶9} After a hearing on March 8, 2024, Grandparents were granted temporary custody of GB-E, with Father having supervised visitation. Grandparents were subsequently added as third-party defendants and a GAL was appointed at Grandparents' request.

{¶10} Since Grandparents split their time between a home in Ohio and a home in Florida, they were ordered to arrange and offer supervised visits with Father and to provide phone/video calls with GB-E. Additionally, Grandparents actually offered to fly Father to Florida once per month at their own expense so he could spend time with GB-E. However, Father only exercised this option one time. He claimed he was busy taking care of his dogs and working; however, as was repeatedly apparent throughout the case, Father's claims to any legitimate, verifiable income were dubious at best.

{¶11} GB-E was enrolled in specialized schooling in Florida where she received significant care. GB-E spent approximately 30 hours per week in specialized schooling and/or therapy. She received speech, occupational, and

behavioral therapy and was, given her restrictions, blossoming in the care of Grandparents.

{¶12} A final hearing was held on pending motions, including Grandparents' motion for legal custody of GB-E, on February 24, 2025. At the hearing both the GAL and Mother recommended that legal custody of GB-E should be granted to Grandparents. Father testified that he was able to properly care for GB-E, and that other than a 30 day jail sentence with work release, his criminal charges had been resolved with sentences of community control. However, despite numerous discovery requests, Father did not provide verifiable income. He claimed to be a partner in a "cane corso" dog breeding and training business that earned him an average of $1500 per month, but he produced no credible records supporting his claims. In fact, he claimed he did not file income taxes for the majority of the previous years because he did not earn enough money.

{¶13} By contrast, Mother testified that Father sold drugs during their marriage to make money in Ohio and in North Carolina. Father's bank account records were presented and there were some arguably unusual deposits in Father's bank account that could have been consistent with Mother's claims.

{¶14} On March 27, 2025, the trial court filed a judgment entry granting legal custody of GB-E to Grandparents. The trial court's entry was thorough, individually summarizing the relevant testimony from each witness. The trial court determined that Mother was voluntarily relinquishing her rights, and that Father was "currently

not capable of providing for a lot of [GB-E's] needs and for her safety in his home, and for that reason, it would be detrimental to award him custody at this time." (Doc. No. 95). The trial court determined that it was in GB-E's best interest to continue in her placement with grandparents.

{¶15} Mother and Father were ordered to have supervised visitation with GB-E. In addition, the trial court stated that Father should not petition for the return of custody of GB-E until he had successfully completed his probation(s). Father now brings the instant appeal from the trial court's judgment, asserting the following assignments of error for our review.

### First Assignment of Error

**The court abuse its discretion in determining that clear and convincing evidence supported its decision to award legal custody to grandparents Robert & Luanne Billstein: Further, the award of legal custody was against the manifest weight of the evidence.**

### Second Assignment of Error

**The trial court abused its discretion in finding the award of legal custody was in the best interests of the child.**

*First and Second Assignments of Error*

{¶16} In both his assignments of error, Father challenges the trial court's determination to grant legal custody of GB-E to Grandparents.

Standard of Review

The Ohio Revised Code defines "[l]egal custody" as:

a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities. An individual granted legal custody shall exercise the rights and responsibilities personally unless otherwise authorized by any section of the Revised Code or by the court.

R.C. 2151.011(A)(21).

{¶17} Importantly, "the award of legal custody is 'not as drastic a remedy as permanent custody.'" *In re J.B.*, 2016-Ohio-2670, ¶ 32 (3d Dist.), quoting *In re L.D.*, 2013-Ohio-3214, ¶ 7 (10th Dist.). Unlike granting permanent custody, the award of legal custody does not divest parents of their residual parental rights, privileges, and responsibilities. *In re C.R.*, 2006-Ohio-1191, ¶ 17. Significantly, the parents can generally petition the court for a custody modification in the future. *In re L.D.* at ¶ 7. Thus, "a parent's right to regain custody is not permanently foreclosed." *In re B.P.*, 2015-Ohio-5445, ¶ 19 (3d Dist.).

{¶18} An award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence.[1] *In re A.D.*, 2023-Ohio-2442, ¶ 62 (3d Dist.). Preponderance of the evidence entails the greater weight of the evidence,

---

[1] Father argues that the trial court's judgment was not supported by clear and convincing evidence; however, that standard is utilized when determining permanent custody cases. This case concerns legal custody, and has a lower burden of proof.

evidence that is more probable, persuasive, and possesses greater probative value. *Id.* Thus, our standard of review is whether a legal custody decision is against the manifest weight of the evidence.

{¶19} In considering whether a court's judgment is against the manifest weight of the evidence, this Court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new hearing ordered. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

Relevant Authority

{¶20} "Jurisdiction in child custody disputes arises under one of two separate statutes, R.C. 3109.04 and R.C. 2151.23." *Scavio v. Ordway, et al.*, 2010-Ohio-984, ¶ 18 (3d Dist.). "Underlying both R.C. 3109.04 and R.C. 2151.23 is the principle that parents are imbued with the fundamental right to care for and retain custody of their children." *Id.* at ¶ 20. Child custody dispute jurisdiction is conferred on the domestic relations court pursuant to R.C. 3109.04(A) when the custody proceedings arise out of "any divorce, legal separation, or annulment proceeding and in any

proceeding pertaining to the allocation of parental rights and responsibilities for the care of a child[.]" R.C. 3109.04(A).

**{¶21}** To safeguard the fundamental parental right to custody, Ohio law mandates that in a child custody case between a parent and a nonparent, the trial court must make an explicit finding of parental unsuitability on the record before awarding legal custody to the nonparent. *Scavio* at ¶ 21; *In re Hockstock*, 2002-Ohio-7208, ¶ 29. "A nonparent may establish unsuitability by demonstrating that '(1) the parent has abandoned the child, (2) the parent contractually relinquished custody of the child, (3) the parent has become incapable of supporting or caring for the child, or (4) an award of custody would be detrimental to the child.'" *In re M.H.*, 2023-Ohio-3776, ¶ 41 (1st Dist.), quoting *In re R.V.*, 2021-Ohio-1830, ¶ 19 (1st Dist.). "If a court concludes that any one of these circumstances describes the conduct of a parent, the parent may be adjudged unsuitable, and the state may infringe upon the fundamental parental liberty interest of child custody." *In re Hockstock*, 2002-Ohio-7208, ¶ 17.

**{¶22}** "In assessing the fourth circumstance (i.e., whether there is a preponderance of the evidence showing that an award of custody to the parent would be detrimental to the child), the focus is on the potential harmful effect on the child." *Heberling v. Deckard*, 2024-Ohio-1535, ¶ 36 (3d Dist.). "When making this assessment, 'the trial court must avoid making a determination based purely on the best interest of the child.'" *Id.* at ¶ 37, quoting *In re M.N.*, 2016-Ohio-7808, ¶ 13

(6th Dist.). "Instead, the court should consider the extent and magnitude of harm the child is likely to experience if placed with his or her natural parent." *Heberling* at ¶ 37.

Analysis

{¶23} Father argues in his brief that the evidence did not support a finding that Grandparents should be awarded legal custody of GB-E. He argues that the evidence was "at best, minimal and conflicting." (Appt.'s Br. at 6). Further, he argues the testimony established that he was a good father.

{¶24} Before we review the evidence that was presented in this case, we emphasize that Father's brief is inaccurate in two respects. First, he argues that the award of legal custody of GB-E to Grandparents needed to be supported by "clear and convincing evidence." However, the proper burden of proof is by a preponderance of the evidence. *In re A.D.*, 2023-Ohio-2442, ¶ 62 (3d Dist.). Second, Father claims that he has been "deprived" of his right to parent his child. This is an overstatement. Grandparents have only been granted legal custody of GB-E, which leaves Father (and non-appealing Mother) with residual rights. *In re C.R.*, 2006-Ohio-1191, ¶ 17. Father's parental rights have not been entirely terminated.

{¶25} In our review of the matter, we must determine whether the trial court clearly lost its way and created a manifest miscarriage of justice by determining that

Father was unable at the time of the final hearing to provide for GB-E, and that it would be detrimental to award custody to Father.

{¶26} The testimony at the final hearing, which the trial court summarized at length in its final judgment entry, established several significant issues with Father. The first issue was Father's criminal history and his ongoing criminal charges/probation. The second issue was Father's lack of income or verifiable employment. A third issue was Father's poorly-explained absences for scheduled supervised visitation appointments.

{¶27} With regard to Father's criminal history, Father acknowledged that he had spent time in prison in North Carolina and that he then violated his parole and was sent back to prison. Later, Father moved to Ohio and married Mother. Father and Mother had a tumultuous relationship wherein both claimed unreported instances of domestic violence. Mother also alleged that Father sold drugs during their marriage to earn an income.

{¶28} On January 1, 2024, Father was involved in an incident that led to him pulling a gun out and pointing it at an individual. In addition, Father's girlfriend ran out of the house with significant fresh bruising on her face. Officers described the injury to Father's girlfriend as appearing to have been caused recently by an object striking Father's girlfriend's face. Father was charged with numerous crimes from this incident, including Domestic Violence, but his girlfriend (who later became his fiancé) did not appear in court so the Domestic Violence and Assault Charges were

dismissed. Father pled guilty to Aggravated Menacing as a result of the incident involving the "Door Dash" driver.

{¶29} Because of Father's gun possession during the January 1, 2024, incident, he was later charged with Having Weapons While Under Disability, a third-degree felony. Father ultimately pled guilty to an "Attempted" violation of Having Weapons Under Disability, a fourth degree felony. At the final hearing, Father claimed that he had never actually possessed a firearm; rather, he claimed that the "Door Dash" driver pulled the gun out, and Father took the gun from the Door Dash driver. While this statement in itself tests the bounds of credibility, Mother testified that Father regularly had firearms in his possession during their relationship.

{¶30} In April of 2024, Father's house was searched pursuant to a warrant. At that time, the search uncovered over $2,000 in US currency, multiple drivers' licenses, a scale with residue which was later found to be cocaine, various containers of marijuana, and a digital scale. Some of the items were found "out in the open" in the home, where a wandering child could have easily reached them. As a result of this incident, Father was charged with, *inter alia*, Trafficking in Drugs and Possession of Controlled Substances, both fifth degree felonies.

{¶31} Father claimed that the marijuana was only for personal use and was purchased in Michigan at a dispensary. He had no explanation for why there was cocaine residue on a scale at his residence. Father's dad suggested that the scale and

cocaine residue were perhaps left in the residence by the prior owner. Father was adamant that no drug trafficking occurred in the home.

**{¶32}** Contrary to his claims, Father's charges, and Mother's testimony that Father had been selling drugs during the marriage, became more troubling when Grandparents looked into Father's finances. Father had not filed any income taxes for the years prior to 2024. He claimed he filed income taxes in 2024, but he did not produce those tax forms.

**{¶33}** Father claimed that he earned money primarily through two means: breeding/training dogs, and working odd jobs for people. Father claimed that he was in a business partnership with a man who lived in the south. He claimed he earned a breeding income of roughly $1,500 per month, but he could not document these numbers. When asked to describe certain "Cash App" transactions, Father testified he was sometimes given cash "gifts" or paid to babysit. Mother testified that Father was paid for his drug sales through "Cash App" and similar means during their marriage.

**{¶34}** Father claimed that he could support GB-E, but he lacked consistent, verifiable income and employment. Father also testified that he was a full-time student at the time of the final hearing.

**{¶35}** Moreover, there were multiple instances while this case was pending that Father missed visitations with GB-E. Father was late to some meetings. In one instance he did not have a working vehicle and said he could not afford an Uber.

More concerning was an instance wherein Grandparents set up a visitation between Father and GB-E for GB-E's third birthday and for a wellness visit Father wanted to attend. Father missed both the birthday and the wellness visit and he did not contact Grandparents to explain. Grandparents repeatedly attempted to get in contact with him over the following week to no avail. Eventually, Grandparents were able to contact Father's girlfriend, and Father's girlfriend stated that Father had been sick and he had a broken phone. These flimsy excuses for his inability to contact his daughter were troubling to Grandparents, the GAL, and the trial court.

{¶36} Undoubtedly Father had undertaken some positive actions in this case. He completed numerous classes and by all accounts Father had a loving bond with GB-E. Nevertheless, Father's struggles with criminal activity, violence, verifiable employment, and follow-through are all made more troubling in this case because of the level of care GB-E requires. GB-E's care was described as a full-time job. Further, she needs consistency and numerous therapies to thrive. Testimony did not establish that Father's life had any regular consistency. In fact, during the final hearing, Father was about to either be incarcerated for thirty days, with work release, or placed on house arrest.

{¶37} Father does not dispute that GB-E is largely thriving in Grandparents' care. Given all of the testimony, and the recommendation of the GAL that Grandparents should be awarded legal custody, we do not find that this is one of the exceptional cases where the evidence weighs heavily against the result. If Father is

able to successfully complete his probation, establish a regular, verifiable source of income, and show consistency, then Father will have the opportunity to seek custody in the future.

{¶38} Based on the record before us, we do not find that the trial court clearly lost its way by determining that Father was not capable of providing for GB-E's special needs, that it would be detrimental to award him custody, and that it was in GB-E's best interests to be placed in the legal custody of Grandparents. *In re A.O, M.O.*, 2025-Ohio-4923, ¶ 26 (10th Dist.); *see also In re C.L.H.*, 2017-Ohio-2925, ¶ 24 (12th Dist.);

{¶39} As the record and the evidence presented overwhelmingly support the trial court's thorough and well-reasoned decision, Father's first and second assignments of error are overruled.

*Conclusion*

{¶40} Having found no error prejudicial to Father in the particulars assigned and argued, his assignments of error are overruled and the judgment of the Henry County Common Pleas Court, Domestic Relations Division, is affirmed.

***Judgment Affirmed***

**ZIMMERMAN and MILLER, J.J., concur.**

Case No. 7-25-04

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

_____
Juergen A. Waldick, Judge


_____
William R. Zimmerman, Judge


_____
Mark C. Miller, Judge

DATED:
/jlm