[Cite as *In re K.B.*, 2021-Ohio-3273.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### HANCOCK COUNTY

IN RE:

    K.B.,                                       CASE NO. 5-20-37

**NEGLECTED AND DEPENDENT
CHILD.**                                        **O P I N I O N**

**[GARLAND B. - APPELLANT]**

IN RE:

    G.B.,                                         CASE NO. 5-20-38

**DEPENDENT CHILD.**                      **O P I N I O N**

**[GARLAND B. - APPELLANT]**

**Appeals from Hancock County Common Pleas Court
Juvenile Division
Trial Court No. 20183005 and 20183006**

**Judgments Affirmed**

**Date of Decision: September 20, 2021**

**APPEARANCES:**

*Alison Boggs* **for Appellant**

*Justin J. Kahle* **for Appellee,** Hancock County Job and Family Services, Children's Protective Services Unit

**SHAW, J.**

{¶1} Father-appellant, Garland B., appeals the November 24, 2020 judgments of the Hancock County Court of Common Pleas, Juvenile Division, granting the motions filed by Hancock County Job and Family Services, Children's Protective Services Unit (the "Agency"), to place his children in the legal custody of Kevin and Nadine Hershey and to terminate its protective supervision. On appeal, Garland argues that the trial court's designation of the Hersheys as the children's legal custodians was not supported by the manifest weight of the evidence. Specifically, Garland argues that granting legal custody to an alternate couple, Sandra and Patrick Fitschen, is in the children's best interests. Garland also claims that the trial court erred when it failed to address the matter of his residual parental privilege of reasonable visitation, and when it failed to consider the statutory factors under R.C. 3109.04(F) in rendering its decision on legal custody.

*Procedural History*

{¶2} On February 6, 2018, the Agency filed a complaint alleging K.B. (born in 2018) to be a neglected child as defined by R.C. 2151.03(A)(2), an abused child as defined by R.C. 2151.031(C), and a dependent child as defined by R.C. 2151.04(C). The Agency filed a second complaint alleging G.B. (born in 2014) to be a dependent child as defined by R.C. 2151.04(C). The complaints were based upon reports to the Agency that the children's Mother, Brittani, tested positive for marijuana and cocaine at the time of K.B.'s birth in January of 2018. K.B. also tested positive for marijuana and cocaine when a drug screen was administered after her birth. Both Mother and Father subsequently produced "non-negative" drug screens after K.B.'s discharge from the hospital. (Feb. 6, 2018 Complaints). The Agency further stated that K.B. had been placed outside the home after her discharge from the hospital pursuant to a safety plan. However, the caretaker under the safety plan could no longer provide care for K.B, therefore, the Agency also requested an ex parte order seeking to place the children in its emergency temporary custody, which the trial court granted.

{¶3} On February 7, 2018, the trial court held a shelter care hearing, found probable cause for the children's removal, and determined that it was in their best interest to continue their placement in the emergency temporary custody of the Agency. The trial court granted the parents supervised visitation with the children.

The trial court also appointed a guardian ad litem/court appointed special advocate ("GAL" or "CASA") to the case. On March 8, 2018, the Agency filed a case plan in the matter.

{¶4} On March 28, 2018, the trial court held an adjudicatory hearing, where by agreement of the parties, the abuse allegations pertaining to K.B. were stricken from the complaint by the trial court. Upon further agreement by the parties, the trial court also found the record contained clear and convincing evidence to adjudicate K.B. as a neglected and dependent child, and G.B. as a dependent child.

{¶5} On May 1, 2018, the trial court held a dispositional hearing and on May 11, 2018, the trial court issued a judgment entry of disposition ordering the children to remain in the temporary custody of the Agency, with the parents continuing to have supervised visitation outside the home. The trial court amended the case plan to order Father to refrain from possessing alcohol or illegal substances and to submit to random drug testing.

{¶6} On October 26, 2018, the Agency filed a Motion for Change of Disposition, requesting the trial court issue an order changing the disposition to place the children in the temporary custody of Nadine and Kevin Hershey (the "Hersheys"), the children's great-aunt and great-uncle, with the Agency having protective supervision.

{¶7} On February 19, 2019 and March 6, 2019, the trial court held hearings on the Agency's motion to change disposition, along with other pending motions, including two motions filed by the parents requesting the children be returned to them. The GAL/CASA filed a report and recommendation prior to the hearings and then filed a supplemental report and recommendation after the presentation of the evidence at the motion hearings recommending that "temporary custody of [K.B. and G.B.] remain with [the Agency] and [the children] be placed with Kevin and Nadine Hershey." (Feb. 13, 2019 and Mar. 13, 2019 reports).

{¶8} On April 11, 2019, the trial court issued a judgment entry overruling the parents' motion to return the children to their home. The trial court also overruled the Agency's request to place the children with the Hersheys. The trial court explained in its judgment entry that the children appeared to be doing well in their current foster care placements and the trial court expressed reservations with disrupting those placements while the Agency's goal in the case continued to be reunification with the parents. Accordingly, the trial court ordered the Agency to continue its temporary custody of the children, in their foster care placements, in order to give the parents further opportunity to demonstrate their commitment to completing the case plan objectives.

{¶9} Nearly a year later, on February 5, 2020, the Agency filed a motion for permanent custody of the children, asserting that it is in the children's best interest

to grant permanent custody to the Agency because the children have been in its temporary custody since February 7, 2018, and the children cannot be placed with either parent in a reasonable time or should not be placed with either parent.

{¶10} On May 1, 2020, the Agency filed Motions to Place Child[ren] in Legal Custody of Kinship Placement & Terminate Protective Supervision, requesting the trial court place the children in the legal custody of Patrick and Sandra Fitschen (the "Fitschens"), and terminate its involvement.

{¶11} On May 19, 2020, the trial court held a hearing on the Agency's motion to place the children in the legal custody of the Fitschens. At the hearing, the Agency modified its request and moved for the children to be placed in the temporary custody of the Fitschens, with the Agency having protective supervision and the parents having supervised visitation. The parents consented to the Agency's motion. The trial court subsequently issued a judgment entry journalizing its grant of temporary custody of the children to the Fitschens effective June 1, 2020.

{¶12} On June 2, 2020, the Agency filed an Emergency Motion for Change of Disposition Placing [the Children in the] Temporary Custody with [the Agency] due it receiving communication from the Fitschens indicating that they no longer wanted the children placed with them. The same day the trial court issued an order placing the children in the temporary custody of the Agency and maintaining their foster care placements.

{¶13} On June 5, 2020, Mother filed a Response in Opposition to Emergency Motion for Change of Disposition Placing [the Children in the] Temporary Custody with [the Agency], requesting the trial court to reconsider placing the children in the legal custody of the Fitschens. Mother claimed that the Fitschens remained willing to be the legal custodians of the children, but they had experienced some frustration and miscommunication with the Agency over the matter. Thereafter, Mother and Father each filed a Motion for Kinship Placement, requesting the trial court place the children with the Fitschens, or in the alternative place the children in the care of the Hersheys, as an additional option to the pending permanent custody motion. The Fitschens then filed a motion to intervene in the case.

{¶14} On September 10, 2020, the Agency filed Motions to Place the Child[ren] in the Legal Custody of Relative & Terminate Protective Supervision, in which it moved for the trial court to place the children in the legal custody of the Hersheys.

{¶15} On September 17, 2020, the Fitschens filed a Motion for Kinship Placement. The same day, the GAL/CASA filed a report in the case recommending that the trial court grant legal custody of the children to the Hersheys, or in the alterative, grant permanent custody to the Agency.

{¶16} On September 23, 2020, the trial court issued a judgment entry granting the Fitschens' motion to intervene for the limited purpose of pursuing their Motion for Kinship Placement.

{¶17} On September 23, 2020 and October 28, 2020, the trial court conducted hearings on the pending kinship placement/legal custody and permanent custody motions. Prior to the presentation of the evidence, the parties agreed to proceed solely on the kinship placement/legal custody motions, acknowledging that these potential placements were an alternative to the Agency seeking permanent custody of the children and terminating Mother's and Father's parental rights. Accordingly, the issue before the trial court was whether it was in the children's best interests to grant legal custody to the Fitschens, or alternatively to the Hersheys. The parties submitted written closing arguments after the conclusion of the presentation of evidence.

{¶18} On November 24, 2020, the trial court issued a judgment entry granting the Agency's motion to place the children in the legal custody of the Hersheys, and overruling the Fitschens' Motion for Kinship Placement. The trial court disposed of the Agency's motion for permanent custody, noting that its placement of the children in the legal custody of the Hersheys rendered the motion moot.

{¶19} It is from this judgment entry that Father now appeals, asserting the following assignments of error.

**ASSIGNMENT OF ERROR NO. 1**

**THE TRIAL COURT'S DECISION GRANTING LEGAL CUSTODY OF THE MINOR CHILDREN TO THE HERSHEYS WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND AMOUNTED TO AN ABUSE OF DISCRETION.**

**ASSIGNMENT OF ERROR NO. 2**

**THE TRIAL COURT ERRED WHEN IT FAILED TO MAKE AN ORDER OF VISITATION WHEN IT AWARDED CUSTODY OF THE MINOR CHILDREN TO THE HERSHEYS.**

**ASSIGNMENT OF ERROR NO. 3**

**THE TRIAL COURT ERRED WHEN IT FAILED TO CONSIDER THE BEST INTEREST FACTORS FOUND IN OHIO REVISED CODE SECTION 3109.04(F)(1) BEFORE MAKING A DECISION REGARDING LEGAL CUSTODY.**

*First Assignment of Error*

{¶20} In the first assignment of error, Father challenges the trial court's decision to grant the Agency's motion designating the Hersheys as the legal custodians of K.B. and G.B. Specifically, Father maintains that the trial court's decision is against the manifest weight of the evidence and not in the children's best interest. Father maintains that the record supports the conclusion that placing the children in the legal custody of the Fitschens is in the children's best interests.

*Legal Standard*

**{¶21}** Pursuant to R.C. 2151.353(A)(3), if the court adjudicates a child abused, neglected, or dependent, then it may grant legal custody to a parent or another person who requests custody. "Legal custody vests in the custodian the physical care and control of the child while residual parental rights and responsibilities remain intact," and "[u]nlike permanent custody, granting legal custody does not terminate the parent-child relationship." *In re M.M.*, 12th Dist. Fayette No. CA2010-12-034, 2011-Ohio-3913, ¶ 7.

**{¶22}** The statutory scheme regarding an award of legal custody does not include an independent test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the children. *In re B.B.*, 9th Dist. Lorain No. 15CA010880, 2016-Ohio-7994, ¶ 18; *In re M.A.*, 12th Dist. Butler No. CA2011-02-030, 2012-Ohio-545, ¶ 15. A court may therefore consider the relevant best interest factors set forth in either R.C. 3109.04(F) or R.C. 2151.414(D) as guidance in determining the best interest of the child. *In re J.T.*, 3d Dist. Union Nos. 14-19-15 and 14-19-16, 2019-Ohio-4520, ¶ 16; *In re H.S.*, 9th Dist. Summit No. 29011, 2019-Ohio-1878, ¶ 13; *In re A.B.*, 6th Dist. Lucas No. L-18-1136, 2018-Ohio-4206, ¶ 11.

*Standard of Review*

**{¶23}** Unlike in a permanent custody proceeding, where an agency's burden is by clear and convincing evidence, the standard in legal custody proceedings is a preponderance of the evidence. *In re B.P.*, 3d Dist. Logan Nos. 8-15-07, 8-15-08, 2015-Ohio-5445, ¶ 19; *In re A.C.*, 12th Dist. No. CA2006-12-105, 2007-Ohio-3350, ¶ 14. "A trial court has broad discretion in proceedings involving the care and custody of children." *In re Mullen*, 129 Ohio St.3d 417, 2011-Ohio-3361, ¶ 14. Consequently, we review a trial court's decision to award a party legal custody of an abused, neglected, or dependent child for an abuse of discretion, and we afford its decision "the utmost deference." *In re E.W.*, 4th Dist. Washington Nos. 10CA18, 10CA19, and 10CA20, 2011-Ohio-2123, ¶ 18, citing *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988). "The phrase 'abuse of discretion' is one of art, connoting judgment exercised by a court which neither comports with reason nor the record." *In re K.Q.*, 11th Dist. Ashtabula No. 2017-A-0060, 2018-Ohio-906, ¶ 14.

**{¶24}** Moreover, a manifest weight challenge concerns " 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.' " (Emphasis sic.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). In a manifest weight challenge "a reviewing court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines

whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *In re C.A.*, 12th Dist. Butler No. CA2014-07-165, 2015-Ohio-1410, ¶ 16. "[E]very reasonable presumption must be made in favor of the judgment and the finding of facts." *Eastley* at ¶ 21. "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment * * * ." *Id*.

*Evidence Adduced at the Kinship Placement/Legal Custody Hearing*

*1. The Hersheys*

{¶25} The record demonstrates that Nadine Hershey is Mother's aunt and that Kevin Hershey is Mother's uncle by marriage. Accordingly, the Hersheys are the children's great-aunt and great-uncle. Several years prior to this case, the Hersheys adopted Mother and Father's older child, E.H. When the Hersheys became aware of this case they reached out to the Agency expressing their willingness to be a possible placement for K.B. and G.B.

{¶26} In the Fall of 2018, the Hersheys began regular visitation with K.B. and G.B. through the Agency. Nadine Hershey testified that visits initially lasted a few hours in duration and "quickly went to overnight, and then it went to several nights." (Sept. 23, 2020 Tr. at 144). Nadine explained that they interacted with the children's foster family frequently. They took the children on family activities to

the places like the zoo, the children's museum, and regularly attended church together. She described K.B. and G.B. as being extremely bonded to her and her husband, their daughter, E.H., who was also the children's biological sibling, as well as their grandson, of whom they also had legal custody.

{¶27} Nadine recalled that their visitations with the children lasted over six months, with more than 100 visits accumulated and the visits lasting five nights a week. However, the Hersheys' visitation abruptly stopped when the trial court denied the Agency's motion to place the children in their temporary custody in April of 2019. Mother and Father had objected to the Agency's motion and provided testimony at the motion hearing characterizing their relationship with the Hersheys as hostile. Mother and Father claimed the Hersheys were deceitful about their intentions to adopt E.H. and did not facilitate their parenting time with E.H. Notably, the Hersheys were not present at these hearings due to the trial court's denial of their motion intervene in the case. Nevertheless, the trial court denied the Agency's motion to place the children in the temporary custody of the Hersheys at that time because the goal in the case remained the children's reunification with the parents and the children appeared to being doing well in their foster care placements. Therefore, the trial court denied the Agency's request to change the children's disposition at that time.

{¶28} The Hersheys claimed that they did not seek further visitation after the trial court's denial of the Agency's request to place the children in their temporary care out of respect for the trial court's decision. They also did not want to prolong any further emotional distress on the other children in the household by pursuing the visitation matter at that time.

{¶29} However, over a year later, the Agency approached the Hersheys regarding legal custody after it had filed a motion for permanent custody and after the children's placement with the Fitschens did not occur. At the hearing on the kinship placement/legal custody motions in the Fall of 2020, the Hersheys were able to present testimony regarding their relationship with Mother and Father. The Hersheys contradicted Mother and Father's claims that they denied Mother and Father visitation with E.H. Nadine Hershey explained that they had facilitated visitation with Mother, Father, and E.H. at the Harmony House, and that Mother and Father were not diligent in attending visitations with E.H.—at one point attending only nine visitations in a year. The Hersheys decided that it was in E.H.'s best interest to adopt her due to Mother and Father's lack of involvement in her life. E.H. had come into their care when she was three-months-old and she was nearly four-years-old when the Hersheys adopted her. Nadine explained that they were the only parents E.H. had known, and that Mother's and Father's consent was not required for the adoption because the court determined that Mother and Father had

financially and emotionally "abandoned" E.H. (Sept. 23, 2020 Tr. at 192). Nadine explained that they had not initially planned to adopt E.H., but decided that she needed the stability provided by adoption.

**{¶30}** With regard to K.B. and G.B., the Hersheys both affirmed that their willingness to facilitate a relationship between the children and Mother and Father. The Hersheys noted that they have legal custody of their grandson and have no issues facilitating parenting time with his mother. The Hersheys asserted that the strong bond their family made with K.B. and G.B. during the several months of visitation was still in place, despite the passage of a year with no contact with them.

**{¶31}** Kelli Miller, the Agency's ongoing case worker, reaffirmed the children's strong bond with the Hersheys. She noted that six-year-old G.B. had consistently expressed his desire to return to their home throughout the case.[1] Leah Cole, the CASA assigned to the case also testified to G.B.'s desire to live with Hersheys. She stated that she was not concerned about the lapse in time between when the Hersheys last had visitation with the children due to the trial court's April 2019 order. She explained her lack of concern was based upon the fact that the Hersheys had such extensive visitation, "six months of visits and every visit was long-term, days, overnight." She recalled that "[G.B.] has expressed to me repeatedly, on every single visit that I've had with him, that he wants to go live with

---

[1] K.B. was two-years-old at the time of these proceedings and was represented by attorney at the hearing.

the Hersheys. When I ask him if he would like to live with the Fitschens, he says, no, I want to live with Uncle Kevin and Aunt Nadine. He has nothing but good memories of them, and he has—he wants to be around his sister, and he tells me that's where he feels at home." (Sept. 23, 2020 Tr. at 106-07).

*2. The Fitschens*

**{¶32}** The Fitschens first became involved in this case in January 2020. Sandra Fitschen had known Father for approximately fifteen years, throughout his childhood, and she had met Mother a few years prior to these proceedings. Sandra recalled being contacted by the Agency as a possible placement for K.B. and G.B.

**{¶33}** Kelli Miller, the Agency's ongoing case worker, testified that the Fitschens began unsupervised visitations in mid-January 2020, which progressed to overnight visitations in February 2020. The Fitschens had accumulated six overnight visitations by the time they were granted temporary custody of the children in May of 2020 via the Agency's motion.

**{¶34}** However, the children were never placed with the Fitschens because both the Agency and the CASA received a voicemail from Patrick Fitschen on May 29, 2020, just days before the temporary custody order went into effect on June 1, 2020, stating that the situation was causing stress in their marriage and it was "more than [they] can handle." (Sept. 23, 2020 Tr. at 93). Patrick continued in the voicemail, which was played before the trial court at the kinship placement/legal

custody hearing, that "I don't think this is going to work with us trying to take a couple young kids, with the stress that's going on between [Sandra] and I right now. I just don't know if we would be suitable to try to raise the kids right now, so I think we're going to have to pass on that for now. If there is anything else we could do, we would, but I—I just don't feel that this is going to work out with me and her, let alone bringing in a couple more kids in there. And I don't want them to suffer with us, with things going on between her and I." (*Id.*).

{¶35} Kelli Miller, the Agency's ongoing caseworker, testified that after receiving the voicemail from Patrick, she unsuccessfully made attempts to contact the Fitschens. She testified to visiting the children at their foster home and informing G.B. that he would not be moving into the Fitschens' home. She recalled that G.B. was "devastated that day when he did not get to move." (Sept. 23, 2020 Tr. at 37). She explained that he was supposed to move earlier in April, but the move was delayed. She stated "[a]nd to be then told again, a month later, that again, he was not going to move, as expected, so he was very upset." (*Id.*)

{¶36} Thereafter, the Agency no longer supported the children's placement with the Fitschens and ended its involvement with them. The Fitschens attempted to reaffirm their interest in being a placement for the children, and claimed that they were frustrated with their communication with the Agency and that the Agency was not forthcoming about the children's medical information. However, testimony

from both the Agency's caseworker and the CASA revealed that the Fitschens had been repeatedly told that there was no lingering or unaddressed medical issues with the children. Leah Cole, the CASA, explained that Sandra Fitschen mistakenly believed that a routine test administered to K.B. was an indication of ongoing health concerns and accused both the Agency and the CASA of concealing the true status of K.B.'s health and withholding medical information.

{¶37} In addition to this issue, both the CASA and the Agency's caseworker were troubled by the Fitschens denial of the statements made by Patrick Fitschen in the voicemail. Specifically, the Fitschens maintained that they never communicated to the Agency that they were no longer interested in being a placement for the children. Sandra claimed that the CASA and the Agency simply misunderstood what Patrick had said in the voicemail, even when she was confronted with a recording of the voicemail.

{¶38} Both the CASA and the Agency were concerned with the lack of consistency the Fitschens demonstrated in their commitment and questioned their ability to be a stable placement for the children. Kelli Miller, the ongoing case worker, cited examples of the Fitschens' delay in completing the home study, the Fitschens' delays, cancellations, and unavailability for visits, and all in addition to the last-minute withdrawal to take legal custody of the children. The CASA also expressed concern with the Fitschens close relationship with Mother and Father,

"[b]ecause if this is a long-term placement, and [Mother and Father] cannot be reunited with their kids, I have concern with the Fitschens potentially allowing them to have access that they should not have." (Sept. 23, 2020 Tr. at 110). The CASA continued, "[t]he parents might like it better, but I don't think that that provides for the children's safety." (*Id*. at 111).

{¶39} Both the Agency's caseworker and the CASA supported the trial court granting legal custody of the children to the Hersheys. Their testimony revealed their confidence that K.B.'s and G.B.'s strong bond persisted with the Hersheys and the lapse of time since the Hersheys had visitation with the children would not be problematic. The ongoing caseworker explained that the Agency intended to implement a transition period for the children to become reacquainted with the Hersheys before it ended its protective supervision. The Agency's caseworker and the CASA testified to their beliefs that the Hersheys would facilitate any visitation granted to Mother and Father. The testimony from these witnesses also focused on the children's need for a legally secure and stable home. Specifically, the CASA explained that G.B. "is very vulnerable right now." (Sept. 23, 2020 Tr. at 118). At the kinship placement/legal custody motion hearing she stated, "I'm more concerned with if [G.B.] goes with the Fitschens, the consequences, if their marriage does not work, or if they can't long term commit to him. I think that that is one more loss he cannot take." (*Id*. at 119).

*3. Father's Positon*

**{¶40}** As previously noted, even though both Father and Mother filed motions requesting the children be placed with the Fitschens, both of the motions also contained alternate requests for kinship placements with the Hersheys. However, at the kinship placement/legal custody motion hearing, Father stated that he disagreed with the motion filed on his behalf by his counsel and strongly objected to the children being placed with the Hersheys. Father described his relationship with the Hersheys as "very hostile" and stated, "I dislike Kevin [Hershey] with every bone in my body." (Oct. 28, 2020 Tr. at 393). Father's testimony revealed that his dislike for the Hersheys stemmed from their adoption of his older child, E.H. Father claimed that the Hersheys lied to him about their intentions to adopt E.H. and did not allow him access to E.H. prior to the adoption. Therefore, Father felt that the Hersheys would not facilitate any visitation he may be entitled to with K.B. and G.B. through his residual parental privileges under the kinship placement.

*Discussion*

**{¶41}** On appeal, Father argues that the trial court's decision to designate the Hersheys as the legal custodians of K.B. and G.B. is against the manifest weight of the evidence because of his hostile relationship with the Hersheys. Specifically, Father claims that the trial court ignored his wishes regarding where his children should be placed.

{¶42} In support of his argument, Father highlights the trial court's April 11, 2019 decision overruling the Agency's motion to grant the Hersheys temporary custody of the children. Father relies on the testimony he and Mother gave at that hearing regarding their past relationship with the Hersheys and the adoption of E.H. However, as already noted, the Hersheys were not present at that hearing to refute any of the allegations regarding their prior conduct with Mother and Father concerning E.H.

{¶43} Nevertheless, in an effort to dispel Father's reliance on the court's prior decision, the trial court discussed the difference in circumstances between the earlier temporary custody motion hearing and the later kinship placement/legal custody motion hearing in its November 24, 2020 Judgment Entry:

> **Both the Fitschens and the father argue that this Court has previously denied a temporary custody placement with the Hersheys. (See Judgment Entry dated April 11, 2019) Although true, the issue presented to the Court at that time was a temporary custody placement with a stated goal of reunification of the minor children with the parents. That is no longer the goal. And although the Court did express concerns over the hostility between the parents and the Hersheys, the Court also noted that the minor children were doing well in the current foster placement, and that the Motion for Temporary Custody was due more to the [Agency's] mandate to attempt placements with relatives rather than a problem with the current placement that needed to be addressed. The goal now is permanency. Additionally, the Court now has significantly more information regarding these issues and the causes of any problems between the Hersheys and the parents. Nothing in the record now, nor this Court's prior decision, prevents a permanent, kinship placement with the Hersheys.**

-21-

(Nov. 24, 2020 JE at fn 11).

{¶44} Father also claims that the trial court ignored his wishes when it granted legal custody of K.B. and G.B. to the Hersheys, and not to the Fitschens. In making its determination the trial court was guided by the factors in R.C. 2151.414(D). These statutory factors include (a) the interaction and interrelationship of the child with their parents and other relatives or caregivers; (b) the child's wishes; (c) the child's custodial history; and (d) the child's need for a legally secure placement. R.C. 2151.414(D).

{¶45} Here, the record supports the trial court's decision to grant legal custody of the children to the Hersheys. The testimony at the kinship placement/legal custody motion hearing demonstrated that the children had developed a strong bond with the Hersheys and their household members, including the children's older sibling E.H., during the over 100 visits they had together in a six-month period of time. The testimony also revealed that G.B. consistently stated his desire to live with the Hersheys. The evidence presented further established that the paramount concern was finding the children a legally secure placement and that the Fitschens had failed to demonstrate they could provide one for the children. Although, Father stated his objections to the Hersheys becoming the children's legal custodians, those objections simply were not supported by the evidence in the record.

{¶46} Simply put, Father does not point to any best interest finding made by the trial court that is unsupported by the evidence in the record. Moreover, the record does not demonstrate that the trial court's decision was unreasonable, arbitrary, or unconscionable to constitute an abuse of discretion. Therefore, we conclude that the trial court's decision to grant the Agency's motion to place K.B. and G.B in the legal custody of the Hersheys was supported by a preponderance of the evidence and was not against the manifest weight of the evidence.

{¶47} Accordingly, we overrule Father's first assignment of error.

{¶48} For ease of discussion, we elect to address the remaining two assignments of error out of order.

*Third Assignment of Error*

{¶49} In his third assignment of error, Father claims that the trial court erred when it used the best interest factors contained in R.C. 2151.414(D) as guidance in rendering its legal custody decision.

{¶50} As noted above, a trial court's decision to grant legal custody must be rooted in the best interests of the child. However, the statutory scheme does not delineate a specific set of factors or criteria that the trial court must apply when determining the best interests of a child in a legal custody proceeding. Therefore, in the absence of statutory guidance, courts are permitted to use R.C. 2151.414(D)(1) (the permanent custody factors discussed above) *or* R.C.

3109.04(F) (factors used for private custody disputes). *See In re J.C.*, 3d Dist. Van Wert No. 15-20-06, 2021-Ohio-1133, ¶ 7; *In re F.B.D.*, 1st Dist. Hamilton No. C-180356, 2019-Ohio-2562, ¶ 12; *see also In re C.N.*, 2d Dist. Montgomery No. 27119, 2016-Ohio-7322, ¶ 51 (recognizing that considering the permanent-custody best-interest factors in a legal-custody case is not erroneous because R.C. 3109.04(F)(1) allows a trial court to consider "all relevant factors," which might include the additional best-interest factors found in R.C. 2151.414(D)).

{¶51} Here, the trial court specifically assessed the best interest factors in R.C. 2151.414(D). Although not required, the trial court also explained its reasons in its judgment entry for choosing to apply the best interest factors in R.C. 2151.414(D) in this case, rather than the ones listed in R.C. 3109.04(F), noting that "[t]he considerations set forth between these statutes are similar, but those set forth in R.C. 2151.414 are more directly related to the issues before this Court." (Nov. 24, 2020 JE at 9).

{¶52} Notably, Father has failed to cite any authority to support his claim that the trial court erred in this manner. Nevertheless, it appears that the crux of Father's complaint is based upon the contention that the best interest factors in R.C. 3109.04(F) specifically require the trial court to consider *his* wishes. It is apparent from the record that the trial court gave due consideration to Father's desire to name the Fitschens the children's legal custodians. However, as already discussed, the

manifest weight of the evidence supported the trial court's decision to place the children in the legal custody of the Hersheys.

{¶53} Accordingly, we find Father's arguments to be without merit and we overrule the third assignment of error.

*Second Assignment of Error*

{¶54} In his second assignment of error, Father claims the trial court erred when it failed to include an order of visitation allowing him to exercise his residual parental privileges of reasonable visitation under R.C. 2151.011(B)(48).

{¶55} The Revised Code defines "legal custody" as "a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities." R.C. 2151.011(B)(21). "Residual parental rights, privileges, and responsibilities" is defined as "those rights, privileges, and responsibilities remaining with the natural parent after the transfer of legal custody of the child, including, but not necessarily limited to, the privilege of reasonable visitation, consent to adoption, the privilege to determine the child's religious affiliation, and the responsibility for support. R.C. 2151.011(B)(48). These rights, however, are not

absolute, but "are always subject to the ultimate welfare of the child." *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).

{¶56} Where, as here, a child has been adjudicated abused, dependent or neglected, that judgment "implicitly involves a determination of the unsuitability of the child's parents." *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, ¶ 22. Furthermore, in a case where there has been an adjudication of abuse, neglect or dependency, a trial court is permitted to "[c]ontrol any [parental] conduct or relationship that will be detrimental or harmful to the child." R.C. 2151.359(A)(1). In other words, Father is not necessarily entitled to visitation with K.B. and G.B under the statute, and the trial court may consider other factors to determine whether granting Father the privilege of reasonable visitation is in their best interests.

{¶57} However, in this instance, Father did not file a motion for visitation in the trial court. Therefore, there was nothing pending before the trial court to issue an order pertaining to Father's residual privilege of reasonable visitation with the children. As such, we conclude no error occurred when the trial court did not address the matter because Father failed to file a motion for visitation in the trial court.

{¶58} Accordingly, Father's second assignment of error is overruled.

{¶59} Based on the foregoing, Father's assignments of error are overruled. The judgments of the Hancock County Court of Common Pleas, Juvenile Division, are affirmed.

***Judgments Affirmed***

**WILLAMOWSKI, P.J. and ZIMMERMAN, J., concur.**

**/jlr**